# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

MERRYL OSDOBY, individually and on behalf of all others similarly situated,

        Plaintiff,

v.

HANDI-FOIL CORP.,

        Defendant.

Case No. 2:22-cv-04199-NG-JMW

**ECF Case**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF MERRYL OSDOBY'S OPPOSITION TO DEFENDANT HANDI-FOIL CORP.'S MOTION FOR SUMMARY JUDGMENT

LAW OFFICES OF
 ROBERT L. KRASELNIK, PLLC
Robert L. Kraselnik (RK 0684)
261 Westchester Avenue
Tuckahoe, NY 10707
Tel.: (646) 342-2019
robert@kraselnik.com
*Attorney for Plaintiff and the Proposed Class*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

LEGAL STANDARD ..........................................................................................................3

ARGUMENT .......................................................................................................................3

I.      Genuine Issues of Material Fact Exist Regarding Standing ...................................3

II.     Genuine Issues of Material Fact Exist Regarding Deception and Injury ..............13

        A.  There Is Evidence that the Labels are Deceptive……………………………14

            Extrinsic Evidence is Not Required to Prove How a Reasonable
            Consumer Would Understand Handi-Foil's "Made in the USA"
            Claim………………………………………………………………….....14

            1.  The FTC's "Made in the USA" Rule Provides the Relevant Standard for
                the Court to Determine Whether Handi-Foil Violated New York GBL
                Sections 349 and 350……………………………………………..…….17

            2.  Under the FTC Standard, Plaintiff Raises a Genuine Issue of
                Material Fact Regarding Deception…………………………….……20

        B.      Plaintiff Has Evidence of Injury…………………..…………….……20

III.    Handi-Foil is Not Entitled to Partial Summary Judgment  ...................................24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)………………………………..………..3, 14

*Bildstein v. MasterCard Int'l Inc.,* 329 F. Supp. 2d 410, 415 (S.D.N.Y. 2004)………………….…….…21

*Colgan v. Leatherman Tool Group, Inc*.,
    135 Cal.App.4th 663, 681-82 (Cal. Ct. App. 2006)……………………………………15, 18, 22, 23, 24

*Craig v. American Tuna*, Case No. 22-cv-473 (S.D. Cal. Dec. 21, 2023)……………………….….…11, 12

*Crawford v. Franklin Credit Mgmt. Corp.,* 758 F.3d 473, 486 (2d Cir. 2014)………………….….13,14

*Ehrbar v. Forest Hills Hosp*., 131 F. Supp. 3d 5, 19 (E.D.N.Y. 2015)………………………………….….3

*Efron v. Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 20 (1st Cir.2000), cert. denied, 532 U.S. 905, 121 S.Ct. 1228, 149 L.Ed.2d 138 (2001)…………………………………………………………….…….13

*Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013)……………………………………………..16

*Guido v. L'Oreal, U.S., Inc.,* Case No. CV CV 11-1067 CAS (JCx), 25 (C.D. Cal. Jul. 1, 2013)…....22, 23

*Honeywell Int'l Inc. v. ICM Controls Corp.,* 45 F. Supp 3d 969 (D. Minn. 2014)……………………….19

*In re Kind LLC "Healthy & All Nat." Litig.,* 627 F. Supp. 3d 269, 280 (S.D.N.Y. 2022)……………….13

*Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 329, 332 (Cal. 2011)……………………….……21, 22

*Kyszenia v. Ricoh USA, Inc.,* 583 F. Supp. 3d 350, 363 (E.D.N.Y. 2022)……………………..……...21
.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,
   475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)……………………………………...…3

*People v. Daniels (1969*) 71 Cal.2d 1119, 1128-1129 [80 Cal.Rptr. 897, 459 P.2d 225]…………..……18

*Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012)………………………………........3

*RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc*.
   527 F. Supp. 3d 305, 321-22 (E.D.N.Y. 2021)………………………………………………………..21

*Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) ……………………………………………………3

*Vaughn v. Consumer Home Mortg. Co*.,
   470 F. Supp. 2d 248, 271 (E.D.N.Y. 2007), aff'd, 297 F. App'x 23 (2d Cir. 2008)……………………21

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................................3

L.R. 56.1 ........................................................................................................................3, 10

## Regulations

16 C.F.R. § 323.2 ...............................................................................4, 6, 15, 18, 19, 20

86 FR 37022 ...................................................................................................6, 15, 19

15 U.S.C. § 45……………………………………………………………………….…8

## INTRODUCTION

Handi-Foil Corp. ("Handi-Foil" or "Defendant") sells its retail disposable aluminum products with a large, unqualified Made in USA claim.  The evidence, however, shows that Handi-Foil's Made in the USA claim is deceptive.

The production of Handi-Foil's aluminum products requires significant foreign processing, as confirmed by Handi-Foil's own metallurgist expert.  This is because bauxite, essential to the production of aluminum, is not available in commercially meaningful quantities or in the metallurgical grades necessary for aluminum metal production in the United States.  A product that incorporates *any* significant foreign processing cannot bear an unqualified Made in the USA claim pursuant to the Federal Trade Commission ("FTC") rule.  This alone renders Handi-Foil's unqualified Made in the USA claim deceptive.

Moreover, the evidence demonstrates that Handi-Foil was completely unaware that its "domestic" suppliers import aluminum coil, the very product Handi-Foil purchases from them to make its purportedly Made in the USA products.  Handi-Foil should not assume that the inputs purchased from domestic suppliers are 100 percent U.S.-made.  Indeed, the FTC recommends that companies making unqualified Made in the USA claims obtain from their domestic suppliers the percentage breakdowns of foreign versus domestic content in the products being purchased from those suppliers.  Handi-Foil did not obtain such a breakdown, nor did it ever seek guidance from the FTC as to whether its Made in the USA claim was proper -- not even in 2020 when Handi-Foil significantly increased the size and frequency of its Made in the USA claim.  Handi-Foil cannot substantiate its unqualified Made in the USA claim, which it must be able to do in order to make the claim.  As a result, Handi-Foil's unqualified Made in the USA claim violates the FTC rule and Handi-Foil is deceiving consumers.

In this litigation, Handi-Foil has not demonstrated that its aluminum products use aluminum derived from the United States -- which would be easy to do if it was the case. Instead, Handi-Foil's defense is premised on the notion that Plaintiff, Merryl Osdoby ("Plaintiff"), a consumer, has no recourse to Handi-Foil's deception because she: (1) has not provided a marketing survey or other extrinsic information to prove what "Made in the USA" means to people, (2) does not know the exact specifications of the FTC's Made in the USA rule, (3) has not proven that Handi-Foil uses foreign-material or incorporates foreign processing in its products, and (4) has not established an actual injury because she has not furnished a price premium calculation. In this way, Handi-Foil puts the onus of its fraud on the victim. Handi-Foil also claims that the FTC's Made in the USA rule is "amorphous" and that therefore Handi-Foil presumably can violate the rule with impunity. This is a false and dangerous justification for Handi-Foil's obviously improper Made in the USA claim, and consumers need to be protected from this manipulative, rule-bending mindset.

Nonetheless, Handi-Foil claims it is entitled to summary judgment against Plaintiff on three grounds: (1) lack of standing, (2) lack of deception, and (3) lack of injury. Genuine issues of material fact, however, exist regarding all three of Handi-Foil's purported grounds for summary judgment. In fact, Plaintiff: (1) has standing, (2) was deceived, and (3) was injured. For purposes of this Opposition, though, Plaintiff need not prove her case, only the existence of genuine issues of material fact. When these genuine issues of material fact are construed in a light most favorable to Plaintiff -- as they must be in determining a summary judgment motion -- they overwhelmingly militate against an award of summary judgment.

## BACKGROUND

Plaintiff respectfully refers the Court to the Facts section submitted in her Memorandum of Law in Support of Plaintiff's Motion for Class Certification, as all the facts set forth there are germane here.    Plaintiff additionally refers the Court to Plaintiff's Local Rule 56.1 Counterstatement of Material Facts, submitted herewith.

## LEGAL STANDARD

"Summary judgment is proper only where, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 19 (E.D.N.Y. 2015) *citing* Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 173–74 (2d Cir. 2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A fact is "material" within the meaning of Rule 56 where it "might affect the outcome of the suit under the governing law." *Id.* at 248. In deciding a summary judgment motion, a court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## ARGUMENT

## I.    GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING STANDING

Handi-Foil claims Plaintiff lacks standing because "there is no evidence that any product Plaintiff purchased incorporated foreign material." *See* Memorandum of Law in Support of Handi-Foil Corp.'s Motion for Summary Judgment ["HF Memo"] at 9. This claim is wrong. It also disregards the "significant processing" prong of the FTC's Made in the USA requirement. In order

3

to make an unqualified Made in the USA claim, the FTC expressly requires that "*all* significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States." 16 CFR Part 323.2 (emphasis added).  Therefore, in producing its products, if *any* significant processing occurred outside of the United States, Handi-Foil's unqualified Made in the USA claim would violate the FTC standard.

Handi-Foil's own expert testified that bauxite is necessary to produce aluminum and that without bauxite there can be no aluminum.  *See* Exhibit 8, Deposition of Steven W. Ping Deposition Transcript ["Ping Tr."] at 99:1-100:1.[1]  He also testified that bauxite is not commercially available in meaningful quantities or in the metallurgical grades necessary for aluminum metal production in the United States. *See* Exhibit 8, Ping Tr. at 97:5 to 97:12. Therefore, an indispensable material necessary for the production of aluminum originates outside of the United States and, consequently, significant processing must take place outside of the United States in order to produce all Handi-Foil aluminum products.

Based on Handi-Foil's own metallurgist expert: (1) Handi-Foil uses foreign materials in the production of its products, and (2) significant foreign processing goes into Handi-Foil's products.  These facts create a state of affairs where a qualification such as "Made in the USA with global materials" would be appropriate and necessary.  Handi-Foil, instead, curiously argues that Plaintiff has no standing because she submitted no evidence to show that the products incorporate foreign material, completely ignoring its own expert's testimony.  Plaintiff *has* provided evidence

---

[1] All "Exhibit" references are to exhibits attached to the Declaration of Robert L. Kraselnik filed in support of Plaintiff's Motion for Class Certification, except for references to the Deposition Transcript of Merryl Osdoby [Osdoby Tr."], the relevant portions of which are attached to the February 22, 2024 Declaration of Robert L. Kraselnik, filed herewith.

to establish that all Handi-Foil aluminum products derive from foreign material and incorporate significant foreign processing, and Handi-Foil's contention that Plaintiff has not provided evidence regarding this point fails.

If bauxite, necessary for aluminum metal production, is not available in the United States at commercial scale, then logic dictates that *any* aluminum product sold by Handi-Foil in America ultimately derives from foreign bauxite and incorporates significant foreign processing. With respect to the materiality of these genuine questions of fact -- i.e., do Handi-Foil products derive from foreign bauxite and do they incorporate significant foreign processing -- these questions are material, as the answers to them determine whether Handi-Foil has violated the FTC's Made in the USA rule. If these questions are construed in Plaintiff's favor and all legitimate inferences are drawn in Plaintiff's favor, then Handi-Foil's aluminum products must be using aluminum that, at a minimum, is produced with significant foreign processing, rendering its Made in the USA claim violative of the FTC standard.

Handi-Foil tries to sidestep these critical facts by claiming that because bauxite is not commercially available in the United States, it is allowed to make an unqualified Made in the USA claim. *See* HF Memo at 20. Handi-Foil fails to recognize the FTC's 2021 codification of the Made in the USA regulations, which expressly clarifies that there is no carve-out for material that cannot be sourced in the United States and that a qualification is still required in this situation. Contrary to Handi-Foil's understanding, nothing in the FTC's codification of the Made in the USA labeling rule, promulgated in July 14, 2021 (effective August 13, 2021), indicates that if materials cannot be sourced domestically then they are not to be included in a U.S. origin analysis. The opposite is true, as the FTC clearly explains that there is not a broad carve-out for situations where a material cannot be sourced domestically:

The 'all or virtually all' standard is designed to prevent consumer deception and, therefore, the Commission declines to... (2) include a broad carve-out for inputs not available in the United States....

\* \* \*

[T]he record similarly does not support excluding foreign content unavailable in the United States from the "all or virtually all" analysis. Specifically, as described above, consumer perception testing has consistently shown consumers expect products labeled as MUSA to contain no more than a *de minimis* amount of foreign content. There is no evidence this takeaway varies in scenarios where some parts or inputs are not available in the United States. Indeed, the Policy Statement explains unqualified claims for such products could be deceptive, for example, "if the [nonindigenous] imported material constitutes the whole or essence of the finished product (e.g., the rubber in a rubber ball or the coffee beans in ground coffee)."

However, the flexibility inherent in the "all or virtually all" analysis accounts for the possibility a marketer could substantiate an unqualified claim for a product containing nonindigenous raw materials if the manufacturer has evidence demonstrating the specific claim in context does not deceive consumers.

16 CFR 323, 86 FR 37022. Thus, the only exception is where a reasonable consumer would know that the material cannot be sourced in the United States and therefore would not be deceived by the Made in the USA claim. Here, Handi-Foil has not put forth any evidence showing that a reasonable consumer would know that bauxite cannot be sourced in the United States in commercially meaningful quantities or in the metallurgical grades necessary for aluminum metal production. Handi-Foil cannot rely on bauxite's unavailability in the United States to justify its unqualified Made in the USA claim.

Another genuine issue of material fact exists regarding this same point – i.e., whether Handi-Foil incorporates non-domestically produced aluminum in its products. Handi-Foil's

domestic suppliers import huge quantities of aluminum coil.  See Exhibit 5.[2]  Aluminum coil is

what Handi-Foil purchases from these domestic suppliers *See* Exhibit 4.  Handi-Foil cannot say

with certainty whether it is purchasing imported aluminum coil, let alone whether imported

aluminum coil is used in its products.  The evidence in the record shows that Handi-Foil's COO,

who is in charge of sourcing major materials including aluminum (See Exhibit 7, Patel Tr. at 20:7

– 20:24), did not know until the day of his deposition in this case that Handi-Foil's domestic

suppliers import aluminum coil. See Ex. 7, Patel Tr.at 66:20-23; 150:22-151:5).  He was surprised

by the revelation. See Ex. 7, Patel Tr.at 66:20-23; 150:22-151:5).  This is why the FTC cautions

companies making unqualified Made in the USA claims to obtain percentage breakdowns of

foreign versus domestic content in the products they are purchasing from domestic suppliers

("manufacturers and marketers would be wise to ask the supplier for specific information about

the percentage of U.S. content before they make a U.S. origin claim").  *See* FTC, "Complying with

the Made in USA Standard," at 6–7 (Dec. 1998), available at https://www.ftc.gov/system/files/

documents/plain-language/bus03-complying-made-usa-standard.pdf (also providing an example

of a certification a marketer could request from a supplier that generally would constitute an

acceptable basis for determining the appropriate country-of-origin designation for a product).

Handi-Foil never sought a certification, as the FTC provides, from its domestic suppliers regarding

the percentage of foreign versus domestic content in the aluminum coil it was buying from those

domestic suppliers.  *See* Exhibit 6, Sarnoff Tr. at 99:2-102:15 (where CEO David Sarnoff

---

[2] Handi-Foil contends that ███████████████████████████ are inadmissible to prove that Handi-Foil's domestic suppliers import aluminum.  Even if this were so, these records are not necessary to prove that Handi-Foil's domestic suppliers import aluminum.  Plaintiff subpoenaed Handi-Foil's primary domestic supplier, ████████████████, which admitted that it imports aluminum. See Exhibit 11, Letter from ████████ counsel, and Exhibit 12, Sources of Primary Aluminum chart provided by ████.

repeatedly gives the same non-responsive answer regarding certification and defers to COO Raj Patel); Exhibit 7, Patel Tr. at 64:1-67:10.

A genuine issue of material fact exists, then, with respect to whether the aluminum coil purchased from Handi-Foil's domestic suppliers and used by Handi-Foil in its Made in the USA-labeled products is imported.   The fact that Handi-Foil did not know that its domestic suppliers imported aluminum creates the inference that Handi-Foil did not know whether its products incorporate foreign material, which would render its Made in the USA claim deceptive as Handi Foil must be able to substantiate its claim:

III. Interpreting U.S. Origin Claims:

The FTC's Deception Analysis

The Commission's authority to regulate U.S. origin claims derives from Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices." The Commission has set forth its interpretations of its Section 5 authority in its Deception Policy Statement, and its Policy Statement Regarding Advertising Substantiation Doctrine. As set out in the Deception Policy Statement, the Commission will find an advertisement or label deceptive under Section 5, and therefore unlawful, if it contains a representation or omission of fact that is likely to mislead consumers acting reasonably under the circumstances, and that representation or omission is material. In addition, objective claims carry with them the implication that they are supported by valid evidence. It is deceptive, therefore, to make a claim unless, at the time the claim is made, the marketer possesses and relies upon a reasonable basis substantiating the claim. Thus, a Made in USA claim, like any other objective advertising claim, must be truthful and substantiated.

See FTC, "Complying with the Made in USA Standard," at 22 (internal references omitted). Without a certification of domestic versus foreign content in the aluminum coil Handi-Foil purchases from its domestic suppliers, and with a conceded knowledge that bauxite is not available

in the United States, Handi-Foil did not possess a reasonable basis to substantiate its Made in the USA claim, rendering it deceptive.

Plaintiff's evidence is not "speculative," as Handi-Foil wrongly characterizes it throughout its brief.  Handi-Foil's own metallurgist expert has firmly established that the aluminum in Handi-Foil's products is derived from and undergoes processing in foreign countries.  Mr. Ping also testified that he was unable to ascertain the exact percentages of primary aluminum in the aluminum coil sold to Handi-Foil by its domestic suppliers.  See Exhibit 8, Ping Tr. at 79:22-81:22. He further testified that Handi-Foil's largest domestic supplier, ███████████████████████████ ███████████████████████████████████████.  See Exhibit 8, Ping Tr. at 75:7-75:16.    Moreover, Plaintiff has proven that Handi-Foil was oblivious to the fact that its domestic suppliers import aluminum. See Ex. 7, Patel Tr.at 66:20-23; 150:22-151:5.

Plaintiff has also proffered evidence showing ██████ did not even begin tracking the amount of primary aluminum it used in the aluminum coil it sold to Handi-Foil until 2022.  See Exhibit 11, Letter from ██████ counsel.  Therefore, even if it sought certification from ██████ regarding foreign vs. domestic content in the coils it purchased -- which it did not -- Handi-Foil could not have determined how much primary aluminum was in the aluminum coil it purchased from ██████ prior to 2022, rendering substantiation of its Made in the USA claim impossible.

Handi-Foil's metallurgist expert also established that the aluminum does not undergo a chemical transformation.  On the contrary, he testifies that the "chemistry does not change."  See Exhibit 8, Ping Tr. at 91:20-92:3; 96:1-96:21.  Thus, any "substantial transformation" argument with respect to imported aluminum coil purchased from domestic suppliers is contradicted by Handi-Foil's own metallurgist expert.  At a minimum, this is yet another genuine issue of material fact, rendering summary judgment for Handi-Foil improper.

Handi-Foil contends that the bauxite is too far removed from the final product, and thus its products can bear an unqualified Made in the USA claim. But Handi-Foil admits that it does not purchase bauxite to manufacture Handi Foil's retail pans and containers. *See,* Handi-Foil's Local Rule 56.1 Material Statement of Facts, Par. 110. Therefore, Handi-Foil is purchasing aluminum that is further along in the manufacturing process and closer to the finished product. Genuine issues of material fact exist regarding how much processing of Handi-Foil's inputs occurs outside of the United States, whether the mining of bauxite and extraction of alumina from the bauxite are significant parts of the process of making aluminum pans, whether the chemistry changes during processing, the costs attributable to that foreign processing, etc. All of these genuine issues of fact go directly to the propriety of Handi-Foil's unqualified Made in the USA claim, and for purposes of this motion must be construed against Handi-Foil.

In vain, Handi-Foil contends that the aluminum coil Handi-Foil purchases from its domestic suppliers is made with ███████████████████████████ in America, and that therefore the aluminum is sourced in America. HF Memo at 12. This argument fails on multiple levels. Preliminarily, the ███████████████ could not have come into existence without foreign bauxite and the significant foreign processing entailed to process it. But even taking this contention as having merit -- which it does not -- Handi-Foil has admitted that it cannot control the availability of ███████████████ in the marketplace. *See* Exhibit 7, Patel Tr. at 76:4-76:8 (where Patel states the percentage ███████████████████████████) Handi-Foil's metallurgist expert testified that he cannot give an opinion as to whether ███████ ███████████ is always available in the marketplace. *See* Exhibit 8, Ping Tr. at 62:2-12. Moreover, Mr. Patel testified that he does not know the precise amount of ███████████████ used in the coils sold to Handi-Foil. *Id.* at 45:4-45:11. He testified that although some of the coils

are comprised of 100% recycled aluminum, ███████████████████████████████████

*Id.* at 69:3-69:19. Without knowing exact percentages, and with ████████████████

████████████████, Handi-Foil cannot rely on its use of ████████████████ to justify an

unqualified Made in USA claim. In any event, this is a genuine issue of material fact, which must

be construed in Plaintiff's favor.

Finally, Defendant cites *Craig v. American Tuna*, Case No. 22-cv-473 (S.D. Cal. Dec. 21,

2023) a deceptive labeling and marketing case brought by Plaintiff's counsel, for the proposition

that the plaintiff had no standing. There, the defendant tuna company alleged that the "Caught and

Canned in America" labels had been removed prior to plaintiff's purchase. In ruling on a motion

for class certification, the court was not convinced that the plaintiff had seen the subject claim at

issue. This is because at his deposition, the defendant did not provide a verbatim recitation of the

label. Instead of "Caught in Canned in America," the plaintiff testified that he thought the label

said "Caught in American waters." This in combination with defendant's affidavit that it had

changed some of the labels prior to when plaintiff made the purchase was enough for the court to

deny class certification. Ultimately, in the *American Tuna* case, the court wanted to see more

command from the Plaintiff regarding the labels that he saw to warrant his representing a class.

Here, the situation is completely different in that Handi-Foil continues to make its Made in the

USA claim (and has in fact enlarged it), and Plaintiff testified that she saw the Made in the USA

claim and the American flag on the label. *See* Exhibit 1, Merryl Osdoby Deposition Transcript

["Osdoby Tr."] at 116:18-25. Unlike in *American Tuna*, here there is no question that Plaintiff saw

the challenged representations. They are hard to miss:



First Amended Complaint, Par. 16.

It should be noted that although class certification was denied in *American Tuna*, on February 20, 2024 the court ruled in plaintiff's favor, declining to dismiss the individual plaintiff's case *sua sponte* and holding that the case would continue on behalf of the individual. *Craig v. American Tuna*, Case No. 22-cv-473, ECF 143 (S.D. Cal. Dec. 21, 2023). Thus, contrary to Handi-Foil's parenthetical in its citation to the case -- i.e., "(no standing in false-labeling case brought by Plaintiff's counsel because plaintiff had no evidence of injury)," *see* HF Memo at p. 13 -- there was no determination made on Plaintiff's standing, only that he did not meet his evidentiary burden of proving he saw the challenged label to warrant his representing a class of consumers. Handi-Foil cites to *American Tuna* in a section of its brief discussing whether a seller's representation matches the facts and whether plaintiff's evidence regarding deception is

speculative.  HF Memo at p 13.  No part of the *American Tuna* class certification ruling dealt with whether American Tuna's U.S.-origin claim was deceptive or whether plaintiff had proffered sufficient evidence on that issue. The ruling was based entirely on whether plaintiff had seen the challenged representation, which, again, is not an issue here.

## II.    GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING DECEPTION AND INJURY

To establish a violation of Sections 349 and 350 of the NY General Business Law, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *In re Kind LLC "Healthy & All Nat." Litig.*, 627 F. Supp. 3d 269, 280 (S.D.N.Y. 2022).  Plaintiff meets these requirements.  Moreover, at the summary judgment stage, Plaintiff only has to show that genuine issues of material fact exist as to these issues, which they do, rendering summary judgment inappropriate.

To obtain a grant of summary judgment, it is the movants burden to show the absence of a genuine dispute as to any material fact.  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  In a futile attempt to carry this heavy burden, Handi-Foil alleges a purported "complete failure of proof" as to the deception and injury elements of Plaintiff's case.  *See* HF Memo at 13.  Handi-Foil cites *Crawford* for the proposition that a "complete failure of proof" concerning essential elements of a claim warrants summary judgment.  *Id.  Crawford*, however, was a RICO case in which the plaintiff alleged that defendants engaged in wire fraud, and in which the court found that plaintiff failed to provide the electronic transmissions necessary to prove her claim. Moreover, as the *Crawford* Court noted, "RICO claims 'premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Crawford*, 758 F.3d at 489 *quoting Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir.2000), cert. denied, 532 U.S. 905, 121 S.Ct. 1228, 149 L.Ed.2d 138 (2001).

Here, on the contrary, Plaintiff has submitted substantial proof evidencing the deceptive nature of Handi-Foil's Made in the USA claim, including expert testimony demonstrating that key materials and processing are foreign, and that Handi-Foil, although utilizing a huge Made in the USA claim, had no idea that its "domestic" suppliers imported aluminum. In determining Handi-Foil's summary judgment motion, these facts -- and the legitimate inferences that can be drawn from them -- must all be weighed and drawn in Plaintiff's favor. As the *Crawford* Court notes: ""Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...."" *Id.* at 486 *quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." Far from "a complete failure of proof," Plaintiff has proffered abundant evidence that -- even without the benefit of the determinations and inferences that must be made in Plaintiff's favor for purposes of this summary judgment motion -- leads to the reasonable conclusion that Handi-Foil should not be making an unqualified Made in the USA claim.

Further, as will be discussed, neither a complicated mathematical damages analysis nor a consumer survey nor any other extrinsic evidence is required for Plaintiff to establish an actual injury. Again, Handi-Foil cannot meet its very high summary judgment burden as, at a minimum, genuine issues of material fact abound.

A.    **There Is Evidence that the Labels are Deceptive**

1.    **Extrinsic Evidence is Not Required to Prove How a Reasonable Consumer Would Understand Handi-Foil's "Made in the USA" Claim**

It is disingenuous for Handi-Foil to claim that its products are Made in the USA, and then contend that Plaintiff's case should be dismissed because she cannot prove what Made in the USA means to people. It is apparent both from the evidence and common sense that Handi-Foil knows the meaning and significance of Made in the USA to consumers, which is why the claim appears in enormous letters combined with an American flag on its products. Handi-Foil even expanded the Made in the USA claim massively in recent years, while its CEO urgently pushed

14

to get the bigger Made in the USA marketing and labeling in front of consumers. *See* Exhibits 2-5 (internal Handi-Foil emails and documents demonstrating the push for larger Made in the USA labels and Made in the USA display cases).

The FTC itself includes in its regulations a reasonable consumer's interpretation of an unqualified Made in the USA claim, developed after years of analysis of consumer perceptions regarding Made in the USA. 16 CFR 323, 86 FR 37022.  The FTC explains in its July 2021 codification of the Made in the USA Labeling Rule that the "'all or virtually all' standard accurately represents current consumer perception regarding unqualified MUSA claims" and that "consumer perception testing has consistently shown consumers expect products labeled as MUSA to contain no more than a *de minimis* amount of foreign content." *Id.*

Based on the FTC's extensive analysis and commonsense interpretation of "Made in the USA," courts have ruled that a consumer survey or a marketing expert or other extrinsic evidence is not necessary to prove what Made in the USA means to a reasonable consumer.   *Colgan v. Leatherman Tool Group, Inc.,* 135 Cal.App.4th 663, 681-82 (Cal. Ct. App. 2006) (imputing FTC's reasonable consumer interpretation of Made in the USA in applying California's Made in the USA statute and rejecting defendants' view that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation).  This vitiates Handi-Foil's argument regarding the necessity of consumer surveys, marketing experts and other extrinsic materials to prove what a reasonable consumer would expect Handi-Foil's unqualified Made in the USA claim to mean.  Accordingly, as neither a consumer survey, nor a marketing expert nor any other extrinsic evidence is required to establish what "Made in the USA" means to a reasonable consumer, Handi-Foil's bid for summary judgment on this issue must fail.

Ultimately, "[t]he primary evidence in a consumer-fraud case arising out of allegedly false advertising is… the advertising itself. And in determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013). Plaintiff respectfully submits that the sheer size of Handi-Foil's Made in the USA claim renders this case different from a standard Made in the USA labeling case, and that a reasonable consumer, beyond interpreting the claim in a manner consistent with the FTC's expectation, would put even more faith in a Made in the USA claim of this magnitude:



SAC at Par 16.  It is reasonable to infer, without needing to resort to a consumer survey or marketing expert, that a consumer would expect this label to mean what it says, and that Handi-Foil possessed a reasonable basis to substantiate it, which it did not.

### 2. The FTC's "Made in the USA" Rule Provides the Relevant Standard for the Court to Determine Whether Handi-Foil Violated New York GBL Sections 349 and 350

Handi-Foil attempts to argue that because Plaintiff brought this case pursuant to the New York GBL, then the federal FTC rule regarding Made in the USA claims has no bearing.  Handi-Foil claims that Plaintiff has not provided evidence to show that "reasonable consumers in today's marketplace share the FTC's view."  HF Memo at 16.  However, as discussed in the previous section, the FTC has conducted years-long, comprehensive consumer perception studies and determined that a reasonable consumer would interpret an unqualified Made in the USA to accord with the "all or virtually all standard."  Handi-Foil has not proffered any evidence to refute the FTC's thoroughly-investigated conclusion that a consumer would expect an unqualified Made in the USA claim to mean that "all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States" and there is not reason for the Court not to utilize the FTC's commonsense standard.  *See, e.g., Colgan*, *supra*.

Handi-Foil claims that since Plaintiff "has never reviewed" the FTC regulations regarding "Made in the USA" before she purchased Handi-Foil products, then she cannot have been defrauded.  HF Memo at 16.  By this logic, a company could make any claim it wanted to so long as the consumer has not reviewed the applicable regulations regarding that claim -- a consumer-blaming argument.  Again, the FTC itself makes clear what a reasonable understanding of an unqualified Made in the USA claim is, and Handi-Foil has cited no cases showing that a

17

consumer must be cognizant of an applicable labeling regulation, let alone intimately familiar with its technical specifications, in order to bring a consumer fraud claim.

Contrary to what Handi-Foil contends, the FTC Made in the USA standard is not "amorphous." It is a straightforward, commonsense rule. The fact that the FTC has declined to delineate a "bright line" percentage with respect to what constitutes "all or virtually all" made in the United States does not render the rule "amorphous" or vague. Flexibility in the rule is not a license for a company to interpret it in whatever way benefits the company, or to disregard it entirely when convenient.

> The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' 'substantial,' and the like. Indeed, a wide spectrum of human activities is regulated by such terms. . . . Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind."

*Leatherman* at *692 quoting People v. Daniels* (1969) 71 Cal.2d 1119, 1128-1129 [80 Cal.Rptr. 897, 459 P.2d 225].

Even if the FTC rule was "amorphous" (it is not), Handi-Foil's situation does not come close to the "all or virtually all" standard. In Hand-Foil's case, the evidence proves that all or virtually all of Handi-Foil's aluminum incorporates foreign bauxite and requires significant foreign processing, certainly nowhere near the thresholds required to merit an unqualified Made in the USA claim.

Handi-Foil claims that different federal agencies have different definitions of Made in the USA, so that Plaintiff cannot rely on any definition to determine if Handi-Foil's Made in the USA claim is false and instead must submit her own consumer survey and expert report on what Made in the USA means. Handi-Foil is wrong, as the FTC's Made in the USA regulations expressly supersede all other federal agencies, including U.S. Customs and Border Protection ("CBP"), except where specifically delineated – such as in the case of specific foods like meat and fish. 16

CFR 323, 86 FR 37022.  Handi-Foil cites to CBP's definition of "substantial transformation" in an attempt to show that "even among federal agencies, "Made in the USA" means different things." HF Memo at 16.  Removing all doubt as to which federal agency controls in the realm of Made in the USA claims on product labels for purposes of consumer disclosure, the FTC states:

> …the record also does not support adopting government standards developed for other purposes (e.g., the CBP substantial transformation standard developed for the imposition of tariffs) as part of the rule. Based on its enforcement experience, the Commission is concerned the standards adopted by CBP for purposes of calculating tariffs are not an appropriate fit for the Commission's regulation of MUSA claims on product labels for purposes of consumer disclosure.

16 CFR 323, 86 FR 37022

Handi-Foil cites another purportedly conflicting federal Made in the USA regulation, the American Recovery and Reinvestment Act of 2009, an economic stimulus package that included a Buy American provision only applying to public building or public works projects funded by the package.  Clearly, the American Recovery and Reinvestment Act has no bearing on a consumer fraud claim involving Made in the USA labels on a common supermarket item.  Even if there was relevance (there is not), the FTC's Made in the USA rule would expressly control.

Handi-Foil also cites *Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp 3d 969 (D. Minn. 2014) for the proposition that Made in the USA "has no universal and definitive meaning." Despite Handi-Foil's contention to the contrary, *Honeywell* is inapposite, as the case involved a huge company suing another huge company under the Lanham Act.  The case did not implicate any state's consumer fraud statute, and the potential purchasers involved were "contractors," not the average consumer at the supermarket.  *Id.* at 989, 990.

Handi-Foil attempts to distance GBL Section 349 from the FTC's Made in the USA rule, arguing that "because Plaintiff brings claims under the NY GBL, this Court is tasked with applying state law, not any definition that might exist in federal law (including the FTC's)." HF Memo at 15. Yet, if an unqualified made in the USA claim does not comply with the FTC standard, the FTC considers the claim to be "an unfair or deceptive act or practice" (16 CFR Part 323.2), language virtually identical to NY GBL 349, which is titled "Deceptive Acts and Practices Unlawful" and provides "[d]eceptive acts or practices in the conduct of any business, trade or commerce… in this state are hereby declared unlawful." Moreover, GBL Section 349 expressly refers to the FTC and provides as a defense to a GBL Section 349 claim compliance with an applicable FTC rule, regulation or statute "as such rules, regulations or statutes are interpreted by the federal trade commission…" This belies Handi-Foil's argument that a court applying NY GBL Section 349 should not look to FTC regulations and to the FTC's interpretation of those regulations to determine whether a deceptive act or practice has been committed under the NY GBL.

### 3. Under the FTC Standard, Plaintiff Raises a Genuine Issue of Material Fact Regarding Deception

Handi-Foil titles a section in its brief: "Even If This Court Enforced the FTC Standard, Plaintiff Does Not Raise a Material Dispute of Fact Regarding Deception." HF Memo at 19. For all of the reasons discussed in Section I, "Genuine Issues of Material Fact Exist Regarding Standing," above, Plaintiff has raised multiple genuine issues of material fact regarding deception under the FTC standard.

### B. Plaintiff Has Evidence of Injury

Handi-Foil claims that Plaintiff "has no evidence of injury due to Handi-Foil's 'Made in the USA' claim." HF Memo at 21. Plaintiff, however, has raised genuine issues of material fact regarding actual injury sufficient to warrant denial of Handi-Foil's motion.

Plaintiff testified at her deposition that she believes Handi-Foil pans are more expensive because they claim to be Made in the USA and that she was willing to pay for them because of the perceived quality of a Made in the USA product.  *See* Ex.1, Osdoby Tr. 185:2-19.  Therefore, if (contrary to Handi-Foil's representation) the pans are not Made in the USA, she has been injured.

None of the four cases cited by Handi-Foil regarding proving actual injury deal with Made in the USA, or even with labeling claims.  Instead, they deal with trademark infringement, foreign currency exchange fees, predatory lending/inflated property values and defective products.  *See, respectively, RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc*., 527 F. Supp. 3d 305, 321-22 (E.D.N.Y. 2021), *Vaughn v. Consumer Home Mortg. Co*., 470 F. Supp. 2d 248, 271 (E.D.N.Y. 2007), aff'd, 297 F. App'x 23 (2d Cir. 2008); *Bildstein v. MasterCard Int'l Inc*., 329 F. Supp. 2d 410, 415 (S.D.N.Y. 2004); *Kyszenia v. Ricoh USA, Inc*., 583 F. Supp. 3d 350, 363 (E.D.N.Y. 2022).

In a California case regarding a Made in the USA claim, the court articulated why consumers would have suffered actual injury if an item that claimed to be Made in the USA was not:

> In particular, to some consumers, the "Made in U.S.A." label matters. A range of motivations may fuel this preference, from the desire to support domestic jobs, to beliefs about quality, to concerns about overseas environmental or labor conditions, to simple patriotism."
>
> * * * *
>
> Plaintiffs selected Kwikset's locksets to purchase in part because they were "Made in U.S.A."… they value what they actually received less than either the money they parted with or working locksets that actually were made in the United States. They bargained for locksets that were made in the United States; they got ones that were not.

*Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 329, 332 (Cal. 2011). *See, also, Leatherman at 689* ("There are many Americans who feel that American-made articles are of higher quality, and who rely on the 'Made in U.S.A.' label").

This is the case here.  Plaintiff testified that Made in the USA is important to her (*See* Exhibit 1, Osdoby Tr. at 29:10-23), as it is for many people (as explained in the FTC rule and cases discussing same).  Indeed, Handi-Foil sells its products with huge Made in USA labels because it ███████████████████████████████████████████████████████████████

███████ *Id*. at 333.  This is the reasonable inference to be drawn from Handi-Foil's CEO

███████████████████████████████████████████████████████████████████ *See*

Exhibits 2-5 (███████████████████████████████████████████████████

██████████████████████████████████).  It is, frankly, hypocritical for Handi-Foil to entice consumers to purchase products with an emphatic unqualified Made in the USA claim, and then claim those consumers have not been injured if the claim is deceptive.

Plaintiff did allege that Handi-Foil products are more expensive than other similar foreign products because Handi-Foil products claim to be Made in the USA.  Plaintiff further testified that she was willing to – and did – pay the increased price. *See* Ex. 1, Osdoby Tr. 185:2-11.

Regardless, neither a price premium calculation nor any expert damages testimony is necessary to establish actual injury. As courts recognize, a company that has made a deceptive claim should not be able to hide behind the purported need for a complicated damages calculation requiring abstruse mathematical formulas.  For example, in *Guido v. L'Oreal, U.S., Inc*., the court, in analyzing the predominance requirement for class certification, found that  expert testimony demonstrating the existence of a measurable impact on a product's market price was not required to award relief to the New York class under the NY GBL Section 349:

However, plaintiffs' lack of expert testimony computing restitutionary relief does not undermine a finding of predominance regarding the New York class. Under N.Y. G.B.L § 349(h), a plaintiff can recover statutory damages in the amount of $50 upon a finding that the plaintiff has suffered injury. Plaintiffs have elected to pursue these statutory damages on behalf of the New York class in lieu of actual damages. Tersigni Decl. ¶ 12. Therefore, no expert testimony demonstrating the existence of a measurable impact on Serum's market price is necessary to award relief to the New York class. Moreover, because awarding classwide relief only requires that a fixed amount of statutory damages be granted to each class member, no individualized damages inquiries are necessary for the New York class. These considerations show that the predominance requirement is satisfied for the New York class.

*Guido v. L'Oreal, U.S., Inc.*, Case No. CV CV 11-1067 CAS (JCx), 25 (C.D. Cal. Jul. 1, 2013).

Essentially, this holding stands for the just proposition that a consumer who has been victimized by a company's deception and who seeks recourse under New York's consumer fraud statutes does not have to come up with a complicated mathematical formula, such as hedonic regression or a conjoint analysis, to represent themselves and a class of New York consumers. The *L'Oreal* Court rightly notes the simplicity of NY GBL Section 349, which awards $50 upon a finding that plaintiff suffered injury. As the attorney in *L'Oreal* submitted an affidavit stating that the plaintiffs would only seek statutory damages for the New York class, the Court rightly dispensed with the need for expert damages testimony. *Id.* Here, too, Plaintiff will seek only statutory damages under the NY GBL and withdraws her expert report. *See* February 22, 2024 Declaration of Robert L. Kraselnik, ¶¶ 3 and 4, attached herewith. The lack of some sort of mathematical formula determining premium differences across multiple products is simply not necessary and does not bar consumers from seeking redress when they have a legitimate grievance against a company that has deceived them under the NY GBL.

Similalrly, in *Leatherman*, applying California's equivalent consumer protection statute and highlighting the same concept, the court found that though it could not ascertain actual

damages, it would apply statutory damages.  As the appellate explained held in upholding the trial court's decision:

> Because it was unable to determine the amount of actual damages, the trial court awarded $1,000, the statutory minimum, for a violation of the CLRA prescribed by Civil Code section 1780, subdivision (a)(1). The trial court stated: "If this Court were able to determine actual damages, this Court would have awarded more than $1,000. How much more, the Court does not know."

*Leatherman*, 135 Cal.App.4[th] at 676.  Here, too, Plaintiff submits that even if her deposition testimony does not establish a price premium, this would not constitute a basis to dismiss Plaintiff's claim on summary judgment.  As discussed, Plaintiff, at the damages stage of trial, will move for the straightforward application of statutory damages under the NY GBL.

## III.    HANDI-FOIL IS NOT ENTITLED TO PARTIAL SJ

Handi-Foil claims that it is entitled to partial summary judgment as to its (i) roll foil product and (ii) website representations.  However, Plaintiff is neither required to see every piece of marketing nor purchase every product in order to represent a class of consumers challenging all of Handi-Foil's Made in the USA marketing and labeling applicable to all of its products.

Handi-Foil's website representations demonstrate Handi-Foil's overall marketing scheme regarding Made in the USA.  So do Handi-Foil's Made in the USA-themed display cases, which can be found in various, but not every, retail location where Handi-Foil sells its products.  It is not reasonable to expect consumers to see every piece of marketing or purchase every product a company sells in order to represent a class of consumers challenging the company's deceptive marketing and labeling wherever it appears on its products.

Moreover, the statements on Handi-Foil's website, which other consumers may have seen, go to Handi-Foil's credibility and therefore should be included in this case.

Accordingly, Handi-Foil is not entitled to partial summary judgment on Handi-Foil's website representations or on the roll foil, which was still being marketed through online retailers with a picture of the Made in the USA label on the package within the limitations period.  At a minimum, this is genuine issue of material fact.

## CONCLUSION

Genuine issues of material fact exist with respect to all three of Handi-Foil's claimed grounds for summary judgment and as a result Handi-Foil's motion for summary judgment should be denied in its entirety.

February 22, 2024                By:    /s/ Robert L. Kraselnik
                                        LAW OFFICES OF
                                         ROBERT L. KRASELNIK, PLLC
                                        261 Westchester Avenue
                                        Tuckahoe, NY 10707
                                        (646) 342-2019
                                        robert@kraselnik.com
                                        *Attorney for Plaintiff and the Proposed Class*

### In the Matter Of:

*MERRYL OSDOBY vs*

*HANDI-FOIL*

---

*MERRYL OSDOBY*

*June 07, 2023*



29

1
2  or Chef Elect.  Chef Elect, that's what
3  it's called.  And US Foil, or something
4  similar to this title.
5      Q.    When you say "this title," what
6  do you mean?
7      A.    Something with the word "foil"
8  in it.
9      Q.    Got it.
10          And why among those different
11 brands, why did you choose Handi-foil?
12     A.    'Cause it says "Made in the US."
13     Q.    Any other reasons?
14     A.    Not really.
15     Q.    Why did you care about made in
16 the US?
17     A.    Because if I have the
18 opportunity, I'd rather buy a product made
19 in the US.
20     Q.    Why is that?
21     A.    Because I want to support the
22 American economy and because I think we
23 have higher standards here.
24     Q.    Any other reasons?
25     A.    Not really.

30

1
2      Q.    Ms. Osdoby, when did you first
3  come to believe this pan or the version of
4  the Handi-foil pans that you purchased
5  were not made in the United States?
6      A.    Well, my -- my brother and I --
7  my brother-in-law and I were talking
8  probably it was during a family event and
9  we were talking about products made in the
10 US and false advertising.  So it came up
11 because he's a history major and I'm just
12 concerned about certain things when it
13 comes to, you know, the environment, et
14 cetera, and -- and products that are made
15 here.  It just came up just like in
16 regular conversation.
17     Q.    And when was that?
18     A.    Last year some time.
19     Q.    Can you pin it down for me when
20 it was?
21     A.    I'm sorry, I can't.  I don't
22 remember.
23     Q.    And how did it come up?
24     A.    I don't remember.  We were just
25 talking about things made in the US and

31

1
2  how hard it is to find stuff made in the
3  US, I think.
4      Q.    Where were you at the time?
5      A.    At -- at his house.
6      Q.    Where is that?
7      A.    I mean, not his house.  I'm
8  sorry.  It was his father's house --
9  father's apartment.  Pardon me.
10     Q.    Okay.
11          And where is that?
12     A.    Westchester.
13     Q.    And at that point in time --
14 well, let's just get this on the record.
15          Mr. Kraselnik is your
16 brother-in-law, correct?
17     A.    Mm-hm.
18          MR. GLICK:  I'm handing you what
19 we will mark as Exhibit 4 --
20          THE WITNESS:  Okay.
21          MR. GLICK:  -- for the record,
22 which is a publicly available document
23 that we captured online from a
24 newspaper called the --
25          THE WITNESS:  Yes.

32

1
2          MR. GLICK:  -- Journal News.
3          THE WITNESS:  Oh, God.
4          (DX-4, Journal News wedding
5  announcement, was marked for
6  identification, as of this date.
7          THE WITNESS:  Yeah.
8  BY MR. GLICK:
9      Q.    And this appears to be a wedding
10 announcement from some time after November
11 of 2002.  Is that fair?
12     A.    Yes.
13     Q.    And this is your wedding
14 announcement, correct?
15     A.    Yes.
16     Q.    Okay.  It says:  Merryl Osdoby
17 and Edward Kraselnik were married November
18 10th, 2002 at the Westbury Manor.
19          Correct?
20     A.    Yes.
21     Q.    And that's you pictured on the
22 left, correct?
23     A.    Yes.
24     Q.    And you're married to a man
25 named Edward Kraselnik?

113

1
2    A.    Yeah.
3          MR. KRASELNIK:  Objection; form.
4          THE WITNESS:  What does that
5    mean?
6    BY MR. GLICK:
7    Q.    This retention agreement was
8    signed by you on June 30th and
9    Mr. Kraselnik on July 1st, 2022.
10          Do you see that on the signature
11   page?
12   A.    The same one you just gave me?
13   Q.    Yeah.
14   A.    Yeah.
15   Q.    Are you aware of whether the
16   Complaint in this case was already being
17   drafted prior to your execution of this
18   agreement?
19   A.    I don't understand your
20   question.  I'm sorry.
21   Q.    You've seen the Complaint that
22   was filed in this case, have you not?
23   A.    This?
24   Q.    Well, let me ask you.
25          No.

114

1
2          The lawsuit that you filed
3    against Handi-foil, have you ever seen it?
4    A.    Have I seen the paperwork?
5    Q.    Yeah.
6    A.    Yeah.
7    Q.    Okay.
8          And my question to you is do you
9    know whether that lawsuit was being
10   drafted before you signed this retention
11   agreement on June 30th of 2022?
12   A.    No.
13   Q.    You're not aware or you don't --
14   A.    I don't know.
15   Q.    You don't know --
16   A.    I have no idea.
17   Q.    Did you review the --
18   A.    I don't --
19   Q.    Did you review the Complaint
20   before it was filed?
21   A.    Yes.
22   Q.    Okay.
23          When?
24   A.    Which -- which -- I'm confused.
25   Which one are you talking about?

115

1
2    Q.    I'm back to Handi-foil now.
3    A.    Okay.
4    Q.    We're off of the other
5    companies.
6    A.    Okay.
7          When did I --
8    Q.    Did you review the Complaint
9    that was filed against Handi-foil --
10   A.    Yes.
11   Q.    -- before it was filed?
12   A.    Yes.
13   Q.    Okay.
14          When?
15   A.    Last June, I think.
16   Q.    Okay.
17          Last June before you entered
18   into this retention agreement.
19   A.    Yeah.
20   Q.    Fair?
21   A.    I believe so.  I'm not sure, to
22   be honest.
23   Q.    Who made the decision to file
24   the Complaint?
25   A.    Who made the decision to file

116

1
2    the Complaint?
3    Q.    Correct.
4    A.    Robbie?  Me?  We both did.
5    Q.    Okay.
6          What convinced you to file the
7    Complaint?
8    A.    The "made in US," the flag and
9    the -- and the -- the focus on, you know,
10   the patriotic symbolism.
11   Q.    Well, let me take a step back.
12          Let's first focus back on
13   Exhibit 1 and the pan, okay?
14   A.    Okay.
15   Q.    I understand that you contend
16   that you purchased other Handi-foil
17   products.
18          So let me ask you what on the
19   Handi-foil's label, I want to know
20   everything that you contend was misleading
21   or false to you.
22   A.    It says "made in the US" and
23   it -- and there's an American flag on it.
24   Q.    Anything else?
25   A.    The "made" and the flag.

Merryl Osdoby - June 07, 2023

185

1
2      Q.    Is price a consideration when
3   you are buying foil pans?
4      A.    They're all pretty much around
5   the same range. I think this one is a
6   little more expensive.
7      Q.    Do you have any understanding as
8   to why?
9      A.    'Cause it's made in the USA
10   supposedly. That's why I figured it would
11   have been more pricey.
12      Q.    Is quality a factor that you
13   consider in choosing between brands?
14      A.    Well, if it's made in the US, I
15   assume the quality is better, yeah.
16      Q.    So you do consider quality,
17   correct?
18      A.    If it's made in the US, yeah, I
19   assume the quality's better.
20      Q.    Are you aware that certain foil
21   pans can be thicker than other types of
22   foil pans?
23      A.    I guess so.
24      Q.    What have you -- since --
25         MR. GLICK: Well, strike that.

186

1
2      Q.    When did you stop buying
3   Handi-foil pans?
4      A.    About last year when we were
5   talking about it.
6      Q.    After the conversation at your
7   father-in-law's house?
8      A.    Yeah.
9      Q.    Have you continued to buy foil
10   pans since then?
11      A.    Yeah.
12      Q.    What kinds?
13      A.    I don't remember the names.
14   Whatever else is there. There's not a
15   huge choice. There's, like, First Chef.
16   I think there's some other kind of foil
17   with "U.S." in the title. I don't
18   remember the exact name.
19      Q.    And have you purchased pans from
20   those companies since that time?
21      A.    Yeah, not -- not a lot, but yes.
22      Q.    How many times have you
23   purchased foil pans in the last year?
24      A.    Usually in the packets, like a
25   few at a time 'cause it's a packet. So, I

187

1
2   don't know, maybe every few months.
3      Q.    Five to six, six to eight. Is
4   that fair -- fair number?
5      A.    Months, you mean.
6      Q.    Five to -- fair to say between
7   five and ten --
8      A.    A year.
9      Q.    -- in the past year in which
10   you've purchased foil pans?
11      A.    Yeah, I think so.
12      Q.    And where were --
13      A.    I'm not sure.
14      Q.    Where were those purchases,
15   ma'am?
16      A.    Mostly Shop Rite.
17      Q.    Anywhere else you can recall
18   buying foil pans in the last year?
19      A.    Well, see, I -- I have a -- a
20   place in the country, so when I go there,
21   I either shop at Shop Rite or Walmart
22   'cause that's all there is. So I don't
23   remember where I got what and when, but
24   either one of those places I would get
25   them.

188

1
2      Q.    And is that in Westchester
3   County, New York?
4      A.    It's in Sullivan County.
5      Q.    Sullivan County, New York.
6         So, but either Shop Rite or
7   Walmart, right, ma'am?
8      A.    Yeah.
9      Q.    Do you investigate where the
10   foil pans that you purchase now are made?
11      A.    Do I -- have I investigated it?
12      Q.    Yeah.
13      A.    Or do I investigate it meaning
14   do I make it a habit?
15         No.
16      Q.    What was the last foil pan that
17   you can recall, brand that you can recall
18   purchasing?
19      A.    I don't know. I don't remember
20   the actual name of it.
21         You want me to go home and get
22   it? I don't know what it's called.
23      Q.    Do you know where that product
24   was made?
25      A.    It doesn't say. It doesn't say