**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

**MERRYL OSDOBY, individually and on behalf of all others similarly situated,**

                           **Plaintiff,**

               **-against-**

**HANDI-FOIL CORP.,**

                     **Defendant.**

-------------------------------------------------------- x

                                     **<u>OPINION & ORDER</u>**

                                   **22-cv-4199 (NG) (JMW)**

**GERSHON, United States District Judge:**

      Plaintiff brings this putative class action for claims that Defendant Handi-Foil Corp. ("Handi-Foil") engaged in deceptive practices and false advertising in violation of New York General Business Law ("GBL") §§ 349 and 350 by labeling its retail aluminum pans "Made in the USA" ("MUSA") when some of its raw materials were mined or processed outside of the United States prior to their domestic sourcing and manufacturing. She seeks relief both in her individual capacity and on behalf of a putative class of "[a]ll Persons who purchased the Products in New York State . . . for personal, family, or household purposes . . . ." Am. Compl. ¶ 34. Although Plaintiff initially defined "Products" to be "aluminum foil pans, aluminum foil containers, aluminum foil roll, laminated board lids and plastic lids," she now seeks certification for only "aluminum pans, aluminum containers and aluminum roll foil." Pl. Mot. Class Cert. 11.

1

Presently before the court are Defendant's motion for summary judgment and Plaintiff's motion for class certification. Defendant's principal arguments for summary judgment are that Plaintiff cannot establish Article III standing and cannot establish the deception and injury elements of GBL §§ 349 and 350. I conclude that, although Plaintiff can establish Article III standing, she has insufficient evidence to go to the jury on the question of injury under the GBL. Therefore, summary judgment is granted to the defendant and class certification is denied as moot.

## I.    Factual Background

The following facts are undisputed unless otherwise indicated.[1] Handi-Foil markets and sells aluminum products at retail establishments in the United States. Handi-Foil's affiliate, nonparty Handi-Foil of America, Inc. ("HFA") manufactures the aluminum products that Handi-Foil sells to consumer retailers. HFA also manufactures aluminum products for institutional customers; those products are not at issue here. Handi-Foil and its affiliates, including HFA, are located in and operate from facilities within the State of Illinois. All of Handi-Foil's retail aluminum pans and aluminum containers (both pans and containers will be referred to here as "aluminum pans") bear labels that include the unqualified statement "Made in the USA" alongside a stylized depiction of the United States flag.

Defendant does not dispute that Plaintiff purchased four specific Handi-Foil aluminum pans: the "Giant All Purpose Pan & Lid," the "Eco-Foil King Size Roaster Pan," the

---

[1] Although Plaintiff states that she "disputes" some of the facts set forth here in her Rule 56.1 Response, she does not always offer conflicting evidence in support of her claimed dispute. Therefore, where she fails to offer such evidence, the facts set forth by the Defendant are deemed to be true. *See* E.D.N.Y. Local Civil Rule 56.1(c)-(d); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 507 (S.D.N.Y. 2014).

"Roaster/Baker Pan," and the "Giant Lasagna Pan." It is also agreed that these pans are all part of Handi-Foil's "Eco-Foil" product line, which is made exclusively from recycled aluminum.[2]

The primary input HFA uses to manufacture its products is aluminum roll coils, which are large-scale strips of thick aluminum that have been formed into coils, each weighing thousands of pounds. HFA does not make these aluminum roll coils in house but instead purchases them from its domestic coil suppliers: Gränges Americas, Inc. and Novelis Corporation ("Novelis").[3] Once the coils reach HFA's manufacturing facilities in Illinois, they are sent to a production line where they are unrolled, fed into a press, and "stamped" into the shape of a pan, leaving excess or scrap aluminum. That excess aluminum becomes recycled aluminum that is typically sold back to HFA's domestic coil suppliers to be melted down and reused for future coils.

Aluminum roll coils are made from one or both of primary aluminum or recycled aluminum. To create primary aluminum, a powder-like substance called alumina is extracted from bauxite, a naturally occurring sedimentary rock. Alumina then undergoes many steps of refining—melting, alloying, casting, rolling, annealing, slitting, and coating—before it becomes aluminum roll coil. To create recycled aluminum, domestic coil suppliers melt down post-consumer scrap aluminum and post-industrial scrap aluminum (from manufacturers like HFA) into molten liquid aluminum that then undergoes the remaining steps in the refining process. Handi-Foil makes pans both from aluminum roll coils made exclusively from recycled scrap aluminum that is obtained from sources within the United States ("recycled coils") and from a combination of recycled scrap

---

[2] Plaintiff attempts to dispute that Eco-Foil pans are made exclusively from recycled aluminum, but does so with citations to the record that do not controvert the evidence proffered by Defendant. Plaintiff also initially alleged that Handi-Foil and/or HFA imported foreign aluminum roll coil (discussed below), but appears to have abandoned this theory, which has no support in the evidentiary record.

[3] A third supplier, Aleris Corporation, was acquired by Novelis in 2020.

aluminum and primary aluminum ("mixed coils"). The Eco-Foil product line is manufactured only from recycled coils.

The parties agree that bauxite is a necessary raw material for aluminum production. They also agree that, although bauxite had been commercially mined in the United States for many years, there are no longer domestic mines in the United States with sufficient amounts of bauxite in the proper metallurgical grades to manufacture primary aluminum on a commercial scale. Since the 1950s, bauxite deposits in U.S. mines have been too low in aluminum content to be competitive with foreign sources. The last year in which any bauxite was mined within the United States for aluminum metal was 1982. It was from a single mine in Alabama. Primary aluminum imported into the United States or aluminum derived from foreign bauxite or alumina will be referred to here as "foreign-derived aluminum" (regardless of how long ago the material was imported or the degree of processing it has undergone since).[4] Given bauxite's current unavailability in the United States, contemporary primary aluminum is necessarily foreign-derived.

Nonetheless, non-foreign-derived aluminum may still exist in the market. Defendant's metallurgical expert, Mr. Steven Ping, opined that bauxite's longstanding unavailability:

> [D]oes not mean that the aluminum being used in the United States today did not come from U.S.-mined bauxite: given that aluminum is a highly recyclable material (sometimes recycled dozens of times), as well as the heavy use of recycled material as an input in the coils used to make Handi-Foil's pans, it is highly possible—if not likely—that some of the recycled aluminum used for coils manufactured by Handi-Foil's suppliers stemmed from primary aluminum at one time smelted from alumina extracted from bauxite that was mined decades ago in the United States.

---

[4] Defendant treats domestically sourced aluminum that has been processed from bauxite or alumina obtained outside the United States and domestically sourced recycled aluminum (regardless of its initial origin) as not containing foreign material. It does so to support its argument that its MUSA labeling is not "deceptive" within the meaning of GBL §§ 349 and 350. As will be seen, this opinion does not reach that issue.

Ping Report 82 n. 156. Thus, it is possible that some Eco-Foil pans may be composed, at least in part, of aluminum made from bauxite mined and processed entirely within the United States.[5]

Even given that possibility, it remains indisputable that foreign-derived aluminum is ubiquitous even within domestic coil suppliers' stock of recycled aluminum. Not only do both post-consumer scrap aluminum and post-industrial scrap aluminum contain a high percentage of foreign-derived aluminum given the decades of bauxite's unavailability, but domestic coil suppliers also import and utilize primary aluminum, which is then re-incorporated into their recycled aluminum stock through the scrap process.[6] Although the parties dispute whether any of the primary aluminum integrated into the mixed coils used to manufacture HFA's non-Eco-Foil retail pans is imported or not, that primary aluminum is, as noted, still foreign-derived.[7] Handi-Foil's chief operations officer estimated that its non-Eco-Foil pans are composed of 50-80% recycled scrap aluminum and 20-50% primary aluminum.[8] This means that the post-industrial scrap aluminum that domestic coil suppliers purchase back from HFA must necessarily contain a high proportion of foreign-derived aluminum. That aluminum, as well as the scrap from other customers, is continuously re-incorporated into the domestic coil suppliers' recycled aluminum supply.

Foreign-derived aluminum is physically indistinguishable from non-foreign-derived aluminum. Mr. Ping testified that there is no test that would determine where the aluminum metal

---

[5] Plaintiff argues in her opposition memorandum that all aluminum within the United States— recycled and primary—must be derived from foreign-mined bauxite, but conceded otherwise in her Rule 56.1 Response (Def. Rule 56.1 Statement, ¶ 112, unresponded to by Plaintiff), and has not pointed to any evidence to counter Mr. Ping's statement quoted above.

[6] The import records submitted by Plaintiff from a third-party website, referred to as the "Panjiva Printouts," are not relied upon here as they are inadmissible hearsay.

[7] It is also undisputed that some imported coils were used to manufacture HFA's products for institutional customers.

[8] The recycled scrap aluminum percentage was alternately stated as 50-80% and 50-85%.

in HFA's coils has come from. Moreover, all of the coils used for its pans are composed of a specific aluminum alloy with a precise chemical composition that is homogenous throughout the coils and all of its resulting products—no matter whether the initial aluminum is foreign, domestic, primary, or recycled. For example, HFA's pans are predominantly made from a 3003R or 3003 alloy: recycled coils are a 3003R alloy and mixed coils are a 3003 alloy, with their only distinguishing feature being whether the aluminum stock they were made with included primary aluminum or solely recycled aluminum. That alloy is created by adding small amounts of other metals to aluminum to reach the required specification, which is identical throughout all of the coils and remains the same throughout the remainder of the manufacturing process.

Although Defendant does not dispute that Plaintiff purchased the four Eco-Foil pans she testified she purchased, it challenges the sufficiency of her evidence about the price premium she claims that she paid for them. Plaintiff testified that she saw Handi-Foil and two other aluminum pan brands while shopping and that she chose Handi-Foil pans because they were labeled "Made in the US." Osdoby Dep. Tr. 28:15-29:12. With respect to price, she stated that she paid "I'm guessing about $8. Depending on the size. You know, I don't know. I think each size is a different price, but I'm assuming. I don't remember exactly." *Id.* at 28:8-14. With respect to comparable brands, she testified that the pans are "all pretty much around the same range. I think this one is a little more expensive." *Id.* at 185:2-6. In her declaration, Plaintiff stated "I paid a premium for something I did not get." Osdoby Decl. ¶ 6. Plaintiff does not have documentary evidence to support her testimony as to her own purchases or as to the price of comparable products.[9]

---

[9] Plaintiff testified that she purchased the pans with her credit card, but did not retain any receipts. She also testified that she purchased the pans at various ShopRite stores in Queens County and Nassau County from 2018 through 2022 (though she could not recall the dates or months of her purchases), but the records from her ShopRite Price Plus discount card from June 2021 through June 2023 did not show any purchases of Handi-Foil products. Plaintiff explained

Plaintiff also testified that she purchased Handi-Foil pans with some frequency. Although Plaintiff recalls purchasing only the four specific Eco-Foil pans at issue, she testified that she did so in each of the five years in question, at several different stores in three different counties. Although she could not recall the specific number of times she purchased pans, she recalled doing so on at least eight occasions. At the time of her purchases, Plaintiff would sometimes buy several pans at a time.

Internal Handi-Foil emails show that the company made its MUSA labeling more prominent in 2020. One email to sales representatives states: "We are very proud that we make our products in the United States and want to ensure our customers are aware. We are updating our labels to better reflect that our products are Made in the USA." Pl. Mot. Class Cert. Ex. 4. Another email, concerning whether orders had been released for delivery, includes a line that the Handi-Foil CEO "wanted them ASAP for the Made in the USA label." Pl. Mot. Class Cert. Ex. 5. Photos in these email chains illustrate that the United States flags were enlarged on the new labeling.

## II. Procedural Background

Plaintiff Osdoby filed her initial complaint on July 18, 2022. Plaintiff's amended complaint, filed on January 17, 2023, is the operative complaint in this action. Presently before me are Defendant's motion for summary judgment, Plaintiff's motion for class certification, and Plaintiff's request to file a sur-reply to supplemental briefing from Defendant. Defendant's motion

---

in a declaration that she uses her ShopRite card only when doing so would result in a discount. She also testified that she purchased Handi-Foil pans at a Walmart store in upstate New York, in conflict with her interrogatory responses. Likewise, with respect to price comparisons, Plaintiff on this motion for summary judgment offers no documentary evidence of the prices of comparable products.

to exclude Plaintiff's expert Dr. Donald May was rendered moot by Plaintiff's withdrawal of Dr. May's expert report.[10]

## III.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists for trial where the evidence favoring the nonmovant is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), but not if "the evidence to support [her] case is so slight" that "no rational finder of fact could find in [her] favor," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation modified). The court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

Although the moving party bears the initial burden of establishing that there is no genuine issue of material fact, "[w]here . . . the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal citations omitted). Once the

---

[10] On November 27, 2025, I denied Plaintiff's letter request to consider Dr. May's expert report despite Plaintiff's withdrawal of the report and failure to oppose Defendant's motion *in limine*. That request, dated November 26, 2025, was filed in response to oral argument almost two years after the February 22, 2024 deadline to oppose the motion agreed upon by the parties and so-ordered by this court on December 5, 2023.

movant has established a *prima facie* case, the burden shifts to the non-movant to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment will not be defeated by a mere "metaphysical doubt" as to the facts, *id*. at 586, nor "on the basis of conjecture or surmise," *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "Conclusory allegations, conjecture, and speculation, as well as the existence of a mere scintilla of evidence in support of the [nonmoving party's] position, are insufficient to create a genuinely disputed fact." *Hayes v. Dahlke*, 976 F.3d 259, 267-68 (2d Cir. 2020) (citation modified).

## IV.   DISCUSSION

### A.   Plaintiff Has Article III Standing

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Given that standing may be challenged "at any stage in the litigation," *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016), "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). While, "[a]t the pleading stage, general factual allegations may suffice," on a motion for summary judgment "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" that demonstrate standing. *Lujan*, 504 U.S. at 561 (citation modified) (quoting Fed. R. Civ. P. 56(e)).

"Constitutional standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (citation modified). Thus, Article III standing must be analyzed as a threshold matter

before an analysis of a GBL claim's substantive merits. *Colpitts v. Blue Diamond Growers,* 527 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (*Colpitts I*). And, Article III standing is "analytically distinct from the question whether the plaintiff" can "sustain a claim under NYGBL §§ 349 and 350." *Fishon v. Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 90 (S.D.N.Y. 2022), *vacated on other grounds sub. nom.*, *Passman v. Peloton Interactive, Inc.*, 2025 WL 1284718 (S.D.N.Y. 2025). Article III standing is also distinct from and must be established prior to class standing. A named plaintiff cannot rely on the standing of unidentified class members, *Lewis v. Casey*, 518 U.S. 343, 357 (1996), and must establish that he or she was personally injured by the defendant's conduct, *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005).

To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury in fact must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation modified). Defendant here effectively challenges plaintiff's showing as to (1) and (2), but has not challenged that (3) a potential injury would likely be redressed by a favorable decision.

A GBL plaintiff can fulfill the Article III standing requirement of injury-in-fact by showing that she incurred a financial injury when she either purchased a product or paid more for a product on the basis of misleading representations. *Colpitts I*, 527 F. Supp. 3d at 575 ("[T]hat a plaintiff would not have purchased a product or would not have paid the same amount comfortably satisfies the injury-in-fact prong of Article III standing."); *In re Nurture Baby Food Litig.*, 2025 WL

918927, at *7 (S.D.N.Y. Mar. 26, 2025) (collecting cases); *see Cantor v. Beech-Nut Nutrition Co.*, 2026 WL 304246, at *2-3 (2d Cir. Feb. 5, 2026).

In consumer cases challenging mislabeling, plaintiffs may establish Article III standing for GBL claims by showing a defendant's challenged conduct was a "widespread, systematic, routine, or uniform" practice. *Kell v. Lily's Sweets, LLC*, 2024 WL 1116651, at *5 (S.D.N.Y. Mar. 13, 2024) (citing *John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 737-38 (2d Cir. 2017) ("*Whole Foods I*")); *John v. Whole Foods Mkt. Grp.*, 823 Fed. Appx. 46, 48-50 (2d Cir. 2020) ("*Whole Foods II*"). As the Second Circuit recently held in *Cantor*, 2026 WL 304246, at *2, at the pleading stage, plaintiff's theory of injury for Article III standing is plausible where it was based on a "systemic failure to deliver on its bargained-for assurances. . . ." Likewise, courts in *LeVy v. HU Prods. LLC*, 2024 WL 897495, at *3-4 (S.D.N.Y. Mar. 1, 2024), and *In re Nurture*, 2025 WL 918927, at *7, found standing where third-party testing showed widespread contamination across defendant's products "sufficient to plausibly allege that [plaintiffs] purchased products containing" those contaminants (*In re Nurture*, 2025 WL 918927, at *7). Conversely, standing was not found where a plaintiff did not show that test results were sufficiently widespread to "be reasonably extrapolated to the plaintiff's individual purchase." *Kell v. Lily's*, 2024 WL 1116651, at *5. *See Bell v. Greenbrier Int'l, Inc.*, 2024 WL 4893270, at *3-4 (S.D.N.Y. Nov. 26, 2024); *Onaka v. Shiseido Ams. Corp.*, 2023 WL 2663877, at *3-6 (S.D.N.Y. Mar. 27, 2023).

Defendant relies on *Whole Foods II* to argue that Plaintiff has not established injury-in-fact because she has not shown that the specific aluminum pans that she purchased contained foreign material. In that case, the Second Circuit found that the plaintiff had not put forth evidence to establish a systematic practice of mislabeling food products sold by weight as heavier than they actually were (and thus more expensive). 823 F. Appx., at 48-49. Therefore, in the absence of the

plaintiff having weighed the specific products he purchased, he had not sufficiently shown that those individual items were underweight (and thus that he had overpaid). *Id.* In so concluding, the Second Circuit reasoned that plaintiff *could have* established Article III injury on the basis of a system-wide or unitary practice, if such evidence were available.[11]

Plaintiff here has shown a systematic practice with respect to the products she purchased —*i.e.*, Eco-Foil products made of recycled aluminum. Sufficient evidence in the record demonstrates that foreign-derived aluminum is routinely incorporated into Defendant's recycled Eco-Foil products such that it is pervasive on a system-wide basis. It is undisputed that bauxite is no longer available in the United States in the metallurgical grades or quantities required for aluminum production. According to Defendant's own metallurgical expert, Mr. Ping, U.S. bauxite mining for aluminum has not been globally competitive since the 1950s and has not taken place at all for over fifty years. Even Mr. Ping's statement that it is "highly possible" that "some" of the recycled aluminum incorporated into the coils used to produce Handi-Foil's pans stems from U.S.-mined bauxite indicates that the majority of it does not.[12] Although Plaintiff is incorrect in arguing that all aluminum in existence must necessarily be derived from foreign-mined bauxite, viewing

---

[11] "[I]f the evidence enabled a jury reliably to find a unitary practice of falsely weighting [prepackaged chocolate cupcakes and cheeses] at Whole Foods, this evidence would enable [the plaintiff's] claims of injury . . . to reach a jury." *Id.* at 48. The Second Circuit specifically found lack of sufficient evidence for "systemwide error," *id.* at 49, and "systematic error," *id.* at 50, for cupcakes and cheese, respectively. The Second Circuit also explicitly declined to express a view on whether evidence showing a high percentage of the products in question were underweight would be sufficient to establish standing at the summary judgment stage, because the plaintiff had not put forth that theory at summary judgment nor on appeal. *Id.* at 49 n. 1.

[12] "Some" is defined as a subset portion of, at least one of, and possibly all of a given number, but commonly thought of as a proportionally small amount. *See Some*, *Merriam-Webster Unabridged Dictionary*, https://perma.cc/4R94-Q2T7; *Some*, *Oxford English Dictionary*, Oxford UP, September 2025, https://perma.cc/H9N7-DKCK.

Mr. Ping's evidence in the light most favorable to the Plaintiff, the incorporation of foreign-derived aluminum is pervasive systemwide throughout Handi-Foil's products.

Other undisputed facts regarding HFA's aluminum supply chain also support this inference. The scrap aluminum used by domestic coil suppliers to manufacture their recycled coils consists of both post-consumer scrap aluminum and post-industrial scrap aluminum from the domestic coil suppliers' customers (including HFA). A significant proportion of that scrap was itself made from foreign-derived aluminum given both foreign-derived aluminum's prevalence in the market and that the domestic coil suppliers utilize imported aluminum and primary aluminum to manufacture coils for other customers, and even for HFA to use in its non-Eco-Foil products. Thus, not only is the domestic coil suppliers' stock of recycled aluminum predominantly foreign-derived, but foreign-derived aluminum and primary aluminum (which is necessarily foreign-derived) is continuously incorporated (and re-incorporated) back into it.

Defendant argues that Plaintiff improperly shifts the summary judgment burden by asserting Plaintiff prevails because Defendant has not *disproven* Plaintiff's speculation that foreign material *could* have been incorporated into Handi-Foil's pans. Defendant is correct in that it can meet its burden by showing Plaintiff has not offered specific facts supporting an essential element of its claim. However, such facts exist in the record here. That some of those facts come from Defendant itself is immaterial to the conclusion that reasonable inferences drawn from those facts in Plaintiff's favor support standing. I find that the inference that most aluminum in HFA's supply chain is foreign-derived is reasonable, non-speculative, and supported by specific facts in the record.

With respect to traceability, Plaintiff has shown a causal connection between her purchases and the Defendant's labeling. Her testimony and the depictions of the MUSA labeling in the record

put forth sufficient evidence that she purchased the pans because of that labeling and would not have done so had she known that the pans contained foreign-derived aluminum. *Accord Dunn v. Ancient Brands, LLC*, 2023 WL 6037853, at *3-4 (N.D.N.Y. Sept. 15, 2023); *In re Nurture*, 2025 WL 918927, at *8.

In sum, I find by a preponderance of the evidence that Plaintiff has established injury-in-fact that is fairly traceable to the Defendant's challenged conduct sufficient to establish Article III standing.

**B.      Plaintiff Has Insufficient Evidence to Establish the Injury Required by the GBL**

GBL §§ 349 and 350 respectively prohibit "deceptive acts or practices" and "false advertising" in "the conduct of any business, trade or commerce." To succeed on §§ 349 and 350 claims, a plaintiff must show that a defendant "engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012)). Both sections are evaluated under the same standard of recovery. *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002). *See also Cosgrove v. Or. Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021). Each requirement of the GBL is dispositive. "Before a plaintiff can recover any damages, whether they be actual or statutory damages, he must first establish each element of his cause of action . . . ." *Colpitts v. Blue Diamond Growers*, 2023 WL 2752161, at *3 (S.D.N.Y. Mar. 31, 2023) (*Colpitts II*). Defendant's motion is based upon arguments that Plaintiff has neither shown that the MUSA labeling was materially misleading, nor that Plaintiff suffered any actual injury. There is no dispute that the conduct proffered by Plaintiff is consumer-oriented.

Turning to the injury element, "a plaintiff must prove 'actual' injury . . . though not necessarily pecuniary harm." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000). "A plaintiff suffers actual injury if, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase." *Colpitts II*, 2023 WL 2752161, at *4 (citation modified).

That a plaintiff has shown Article III standing does not mean she can meet the standard for actual injury under the GBL. The Second Circuit has noted that "[i]njury in fact [for Article III standing] is a low threshold, which . . . 'need not be capable of sustaining a valid cause of action.'" *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008). *See DaCorta v. AM Retail Grp., Inc.*, 2018 WL 557909, at *6-9 (S.D.N.Y. Jan. 23, 2018) (finding injury-in-fact for Article III standing, but lack of GBL injury); *Borenkoff v. Buffalo Wild Wings, Inc*., 2018 WL 502680, at *3-4 (S.D.N.Y Jan. 19, 2018) (same).

There are several recognized methods by which a plaintiff can show "actual injury" under the GBL. Given that Plaintiff's theories of injury have shifted substantially since initiating this action, each one will be addressed in turn.

### 1. Price Premium Injury

A price premium theory of injury is "[o]ne method of demonstrating actual injury in the consumable goods context . . . by showing that the plaintiff paid a 'price premium'—that is, as a result of the defendant's deception, the plaintiff paid more for a product than he otherwise would have." *Eidelman v. Sun Prods. Corp.*, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022). The most common means of showing price premium injury "is to establish that the product at issue sells for a higher price than a comparable product because of its use of the deceptive claim." *Id.* This requires showing (1) that there are one or more comparable products that both sell at a lower price *and* lack the deceptive claim, and (2) that the higher price is the *result* of the deceptive claim. *Id.*

Plaintiff fails to put forth evidence from which a reasonable jury could conclude that Defendant's products that she bought sold for a price premium relative to comparable products that lacked MUSA labeling. With respect to her reliance on an allegation in the Complaint, it is axiomatic that allegations are not evidence, and a party opposing summary judgment cannot defeat it by relying on them. *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). In her deposition, Plaintiff made several separate but equally vague assertions regarding other aluminum pan brands and pricing. Yet even with respect to the approximate price she quoted, Plaintiff admitted that she was "guessing" and "assuming" she paid "around $8, depending on the size," and "[didn't] remember exactly." Osdoby Dep. Tr., 28:8-14. Her evidence that Handi-Foil pans command a higher price amount to assertions that "I think this one is a little more expensive," *id*. at 185:2-6, and that "I paid a premium," Osdoby Decl. ¶ 6.

These are the types of conclusory statements, conjecture, and speculation that cannot defeat summary judgment. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *Barnes v. Craft*, 2008 U.S. Dist. LEXIS 110155, at *11 & nn.32-34 (N.D.N.Y. July 24, 2008) (collecting cases), *report and recommendation adopted*, 2008 WL 3884369 (N.D.N.Y. Aug. 18, 2008). Plaintiff does not set forth "specific facts" demonstrating that there is "a genuine issue for trial." Fed. R. Civ. P. 56(e)); *Snead v. City of New York*, 463 F. Supp. 3d 386, 394 (S.D.N.Y. 2020). Specifically, in the GBL context, plaintiffs' general statements about how much they "think" they paid are insufficient to defeat summary judgment where they lack any other specific evidence for establishing a price premium. For example, in *Reyes v. Upfield US Inc.*, 2025 WL 786656, at *8 & n.11 (S.D.N.Y. Mar. 12, 2025), the court granted summary judgment to the defendant for lack of evidence of actual injury because the plaintiff could not support the complaint's price-related allegations; there, as here, the plaintiff testified as to the approximate

price she "'think[s]' she paid" ("about $5"), but had no receipts or other documentary evidence of her purchases, nor any evidence as to the prices of competing products. Likewise, in *Weiner v. Snapple Bev. Corp.*, 2011 WL 196930, at *3-5 (S.D.N.Y. Jan. 21, 2011), the court granted summary judgment where plaintiffs failed to specifically identify the cost of comparable beverages and had no record of their purchases. Notably, the court found plaintiffs lacked "sufficient specificity [as to] the cost of comparable beverages offered for sale at the time of their [] purchases." *Id*. at *4.

Here, Plaintiff offers neither specific testimonial facts nor records to support her speculative and conclusory statements. She does not provide dates, months, or specific locations of her purchases, nor documentary evidence of them: no receipts, no bank or credit card statements, nor any pertinent entries in her frequent shopper card records. Nor has she put forth any other admissible evidence of pricing. Even treating her testimony as sufficient evidence for her own purchases, the record is insufficient to create an issue of fact as to the cost of comparable products. Without such evidence, she cannot establish the price premium theory of injury.

Plaintiff argues that Handi-Foil's internal emails enlarging the MUSA labeling are evidence of injury because they illustrate the value that Handi-Foil placed on that labeling. However, these emails at most relate to the causation element of a price premium, not that the higher price exists. In other words, *if* Plaintiff had established that Handi-Foil pans were sold at a higher price than its comparators lacking MUSA labeling, these emails could be evidence that the higher price was a result of the alleged mislabeling. *See Eidelman*, 2022 WL 1929250, at *2 (evaluating internal company emails for whether they were evidence that a higher price was attributable to an allegedly misleading claim only after finding that plaintiff had established a

lower-priced comparator product). Plaintiff's fatal problem here is that she has not shown such a higher price exists in the first place.

### 2. Statutory Damages-as-Injury

The availability of statutory damages under the GBL does not eliminate the need to demonstrate actual injury. *Colpitts II,* 2023 WL 2752161, at *3. The idea that Plaintiffs can substitute statutory damages for injury under the GBL has been "explicitly and unambiguously" rejected by the New York Court of Appeals. *Id*. (citing *Stutman v. Chem. Bank*, 95 N.Y.2d at 29). *See Reyes v. Upfield*, 2025 WL 786656 at *8 & n.12. Plaintiff's arguments to the contrary are unavailing because they conflate injury as a required element of a GBL violation with the damages that would be awarded as a result of that violation. Statutory damages are not a viable theory of injury.

### 3. Deception-as-Injury

Similarly unavailing are Plaintiff's assertions that Handi-Foil's alleged deception itself was an actual injury. Plaintiff argues that she was injured because the pans she purchased were not made in the United States, as she thought they were, and that she would not have purchased them if she had known that was the case.

New York law is clear that injury cannot be merely the deception itself. *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 56 (1999). In *Small*, plaintiffs asserted that they were injured by cigarette manufacturers' claims that cigarettes were not addictive, but, crucially, did not argue that they were physically harmed by the products, nor that they paid a price premium for them, nor that the cigarettes were of a different physical composition or lesser quality than promised. *Id.* Instead, they argued only that the "deception prevented them from making free and informed choices as consumers," *id.*, and that they never would have purchased the cigarettes "but for defendants'

fraudulent and deceptive practices," *id.* at 51. *Accord Colpitts I*, 527 F. Supp. 3d at 576 ("In the consumer goods context, an allegation of a defendant's deception alone does not suffice to plead injury, because a plaintiff may have received the benefit of the bargain despite the alleged misrepresentation."); *Binder v. Premium Brands Opco LLC*, 2024 WL 2978506, at *6-7 (S.D.N.Y. June 11, 2024) (finding that plaintiff's argument that she "would not have made her purchase without the misrepresentations" fails as a "subjective disappointment theory of injury").

Plaintiff's reliance on *Colgan v. Leatherman Tool Grp. Inc.,* 135 Cal. App. 4th 663 (Cal. Ct. App. 2006), and *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877 (Cal. 2011), in arguing that MUSA mislabeling alone is a cognizable injury is misplaced. These California cases interpreted California consumer protection statutes. Deception-as-injury claims are cognizable under California law, whereas they are not under the GBL. *See Binder v. Michael Kors (USA), Inc.*, 2024 WL 3227943, at *4, *6 (S.D.N.Y. June 28, 2024).

### 4. Quality-Based Injury

Actual injury may also exist under the GBL where a plaintiff can show that a product is worth less than was paid for it because it is mislabeled in a material way that renders it objectively less valuable. This type of injury exists where the deceptive labeling pertains to a unique physical quality or effect, *i.e.*, the product is in reality made from a different physical material, lacks (or includes) a particular ingredient, is of a lower quality, or does not have a particular advertised effect. *See, e.g., Ashour v. Ariz. Bevs. USA LLC*, 2025 WL 961682, at *9 (S.D.N.Y. Mar. 28, 2025) (iced tea beverages marketed as having no preservatives contained preservatives); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 292-93 (S.D.N.Y. 2015) (Cold-EEZE products did not have the advertised effect of shortening colds); *Ebin v. Kangadis Food Inc.*, 2014 WL 737878, at *1-2 (S.D.N.Y. Feb. 25, 2014) (inferior pomace oil labeled and priced as olive oil).

Although Plaintiff has made vague references to quality in testifying that she purchased Handi-Foil pans because "if it's Made in the US, [she] assume[d] the quality is better" (Osdoby Dep. Tr., 185:14-15), she asserts only that she *perceived* that MUSA pans would be of better quality, not that they actually were. Indeed, Plaintiff conceded at oral argument that there is no evidence in the record that the pans were of lesser quality. Oral Arg. Tr. 46:16-18, Nov. 17, 2025. Plaintiff has likewise put forth no evidence that the pans lacked a distinct physical quality, did not have a desired effect, or did not perform as expected. In sum, she has no evidence of a quality-based injury.

### 5. Detrimental Reliance

Plaintiff belatedly argues injury under a detrimental reliance theory, but again fails to provide evidence of actual injury. Plaintiff relies on *Brockington v. Dollar Gen. Corp.*, 2025 WL 486173 (S.D.N.Y. Feb. 13, 2025), which stated that:

> A plaintiff may demonstrate injury and causation for purposes of Sections 349 and 350 in at least one of two ways: (1) he can show that he paid a premium as a result of the deception…; and/or (2) he can show that he was exposed to a material deceptive act and relied on that misrepresented fact to his detriment.

At *4. But "detriment" still requires actual injury. *Id.* at *5-6; *Kelly v. Beliv LLC*, 2024 WL 1076217, at *9-11 (S.D.N.Y. Mar. 12, 2024).[13] Because Plaintiff has not shown evidence of that injury beyond her own subjective disappointment, this theory of injury also fails.

### C. Materially Misleading Labeling

---

[13] *Brockington* and the line of cases it relies on distinguish these two avenues of showing injury to illustrate that a price premium injury does not require individual reliance, whereas a detrimental reliance injury does. *See Fishon v. Peloton*, 620 F. Supp. 3d., at 99-100; *Rodriguez v. Hanesbrands Inc.*, 2018 WL 2078116, at *4-5 (E.D.N.Y. Feb. 20, 2018), *report and recommendation adopted*, 2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018). These cases do not support the claim that detriment can be deception alone.

In light of the conclusion that Plaintiff has failed to provide sufficient evidence supporting the injury element of her GBL claims to go to the jury, I do not address Defendant's motion insofar as it argues that Plaintiff's proof of deception is also inadequate.

## V.  Request to File Sur-Reply

Plaintiff requests leave to file a sur-reply to Defendant's second notice of supplemental authority. But Plaintiff's sur-reply addresses Defendant's argument that *Plaintiff* has impermissibly raised a new argument by asserting the theory of detrimental reliance discussed above. Plaintiff is therefore not entitled to a sur-reply. In any event, nothing in the sur-reply affects my conclusion.

## VI.  Conclusion

Plaintiff has established Article III standing, but has failed to provide evidence sufficient to go to the jury supporting injury, a necessary element of her GBL claims. For that reason, Defendant's motion for summary judgment is GRANTED.

Plaintiff's motion for class certification is DENIED as moot because Defendant's motion for summary judgment is granted.

Plaintiff's request to file a sur-reply is DENIED.

**SO ORDERED.**

_____/S/_____

**NINA GERSHON**
**United States District Judge**

February 11, 2026
Brooklyn, New York